14   427<br>30   137

[No. 2853.]

## WILLIAM REYNOLDS *v.* THE STATE.

1. MURDER—IMPLIED MALICE—CHARGE OF THE COURT.—See the opinion *in extenso* for a charge of the court upon implied malice *held* error; and note also the reasons wherefore it is held erroneous.

2. MANSLAUGHTER—CHARGE OF THE COURT—PRACTICE.—See the opinion *in extenso* for a state of case wherein it was the duty of the court to submit, in the charge to the jury, the law of manslaughter.

3. SAME.—In charging the jury the judge should instruct hypothetically upon whatever state of facts there is evidence tending to prove.   It is error for him to submit to the jury a fact or state of facts of which there is no evidence, or to give an instruction with reference to a state of facts not in evidence.   But, in order to justify him in giving an instruction predicated upon a supposed state of facts, it is not necessary that he

should be entirely satisfied of such facts; but if there is evidence from which the jury may infer them to be true, it is his duty to declare the law thereon; and it is not error for him to do so even when the evidence is very slight.

Appeal from the District Court of Frio. Tried below before the Hon. D. P. Marr.

The indictment charged the appellant with the murder of J. H. Barnes, on the eighteenth day of September, 1878, in Frio county, Texas. His trial resulted in a conviction of murder in the second degree, and he was awarded a term of five years in the penitentiary as punishment.

W. C. Daugherty was the first witness for the State. He testified that he was in the town of Frio on the eighteenth day of September, 1878, when the defendant shot and killed James H. Barnes. The witness went down into the cellar under Bibb's store just before the shooting. On coming up he saw the defendant sitting on his horse in front of the store. The defendant spoke to the witness as the latter came up, and said: "What kind of people have you got here that they will beat up an old man like the one over at the grocery?" About that time the deceased, who was drinking, and, in the opinion of the witness, drunk, came up to the witness and the defendant, and of the latter asked: "Do you take it up?" The defendant replied: "I don't know but what I do." It was the impression of the witness that the defendant then took out his pistol. The deceased then laid his right hand upon or around the horse's neck, and his left hand on the defendant's leg about his pants pocket, of which he took hold. The defendant once, or perhaps twice, ordered the deceased to release him, which he did not do. Thereupon the defendant struck the deceased over the head with his pistol. The deceased released the horse's neck and the defendant's leg, and caught the bridle reins of the defendant's horse with both hands. The horse wheeled around and the defendant fired, the ball taking effect in the shoulder and near the neck of the deceased and ranging downward.

The witness took hold of the deceased and eased him down, and with the assistance of other parties carried him into a house near Bibb's store. He never spoke after he was shot, and was dead by the time the parties got him into the house. The pistol which was here exhibited to the witness was the pistol which was worn by the deceased at the time he was shot. Then, as now,

it was tied into the scabbard with large white buck skin thongs, without untying and removing which it could not be withdrawn from the scabbard. The deceased was in his shirt sleeves when he was shot, and his pistol so tied in the scabbard was plainly in view. The deceased made no effort to strike the defendant nor to draw his pistol, nor other hostile demonstration that the witness saw, nor did he make any other remark than that stated. The defendant lived at that time in Uvalde county, and was but slightly acquainted in Frio county. The witness saw the defendant and the deceased together that day, and saw them take a drink together.

D. J. Feehan testified, for the State, that he was present when the deceased was killed by the defendant. While the witness was standing in front of Bibb's store the deceased passed along in front of the store, going from the direction of Harkness's grocery. He passed around the corner of the store, and out of sight for the time. He was drunk and staggering. A short time later the defendant rode up to the front of Bibb's store from the same direction, and the witness heard him speak to some one. The deceased, who had returned from behind the store, walked up to the defendant, and put his right hand on the horse's neck, and his left on the defendant's thigh. The witness did not hear what was said by the parties but saw the defendant strike the deceased over the head with his pistol, knocking the ramrod and guard off of the weapon. The deceased staggered back and fell in front of Bibb's store. He got up and started to the horse again, and the defendant fired, striking the deceased in the shoulder near the neck. Witness, Daugherty and others took the deceased into the house. He died very soon after he was shot.

The witness did not see Daugherty take hold of the deceased until he went to assist in carrying him in after he was shot. He, witness, was looking at the parties all the time. He did not see the horse turn around at all. He did not know that the defendant drew his pistol when the deceased first approached him. Witness first saw the pistol when the defendant struck the deceased on the head with it. The deceased made no effort to draw his pistol, to strike the defendant, or to do him violence of any character that the witness saw. Deceased was drunk. Bibb's store and Harkness's saloon were about fifty or sixty yards apart. Witness knew nothing about the deceased and any other party having a difficulty the same day.

T. B. Bibb, for the State, gave substantially the same account of the affray as that given by Daugherty, adding that the defendant several times repeated his order to the deceased to release him and his horse, before he fired. His testimony, however, is set out in full in the opinion of the court.

A. S. Curetan, a justice of the peace at the time of the killing, testified, for the State, that he was not in town when the shooting occurred, but reached town just afterward. He was told of the shooting, and was getting ready to go and arrest the defendant, who was then sitting on his horse in front of Bibb's store, when he, defendant, turned and with pistol in hand rode toward the house where the witness was. He rode in this direction some distance in a slow gait, but presently, striking a gallop, he called to Ben White: "Come on Ben; I am the best G—d d—d man who ever struck Frio town." He then rode off, going north.

Jerome Ridley testified, for the State, that he was in Harkness's saloon when the defendant rode up to the door and saw old man Everett lying on the floor, where he had been knocked down. The defendant said: "Whoever did that is a d—d coward, and I can whip him." Witness said to him: "I would not do it, Bill; it has been done now, and cannot be helped." The defendant then said that he would not. He then rode off, saying that he was going to see Bill Daugherty. The witness heard a shot in a short time. He did not tell the defendant who the man was that had been knocked down.

Cross-examined, the witness said that old man Everett was the man lying on the floor. He was very bloody. He had been knocked down by the deceased a short time before. The witness did not think that the defendant and Everett were acquainted.

J. C. B. Harkness testified that shortly after the deceased left his saloon the defendant rode up and spoke to Ridley, and then rode on to Bibb's store. Witness was induced by what Ridley said to look after defendant. He saw him strike the deceased over the head, and stagger him, and then shoot. Parties rushed in and around the deceased, and the defendant rode off up Frio river. The witness went to Bibb's store and saw the deceased dead.

John Henman testified that he was present and saw the shooting. He gave, in detail, an account similar to that given by the witness Daugherty, except that he said nothing about the words imputed to the parties by Daugherty. Deceased made no hostile

demonstrations towards the defendant that the witness saw. Witness knew that the deceased's pistol was tied in the scabbard, for he saw the deceased tie it to prevent it falling from the scabbard while riding.

Cross-examined, the witness said that he had testified in this case before, but had never said that the deceased attempted to draw his pistol. The deceased was drunk when he was shot.

The motion for new trial assailed the charge of the court, and attacked the verdict as unsupported by law or evidence.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for murder of the second degree, the punishment being assessed at confinement in the penitentiary for five years.

It is frequently the case that there is evidence tending to present different degrees of culpable homicide. And in this case it was insisted, in the motion for new trial, that the court erred in its charge upon implied malice, and in failing to charge the law applicable to manslaughter, evidently upon the supposed ground that there was evidence presenting manslaughter. If there was evidence tending to present the issue of manslaughter, an erroneous instruction or definition of implied malice may have worked an injury to the defendant; and if there was such evidence, most evidently a failure to charge the law applicable to that degree of culpable homicide was calculated to injure defendant, such an omission having the effect to confine the jury to the higher degrees, and to force them to convict of the higher or acquit altogether.

The charge of the court upon implied malice is as follows: "Implied malice is malice presumed by law from the commission of any deliberate and cruel act, howevers udden. done or committed without legal excuse or justification. This kind of malice is not a question of fact for the jury to decide like express malice, but it is an inference or conclusion of law drawn from or founded upon particular facts and circumstances which the jury ascertain to exist from the evidence before them. For example, if a homicide is committed and there is not evidence sufficient to show express malice, nor to excuse or justify the act, the law presumes malice which is termed implied malice, and

the killing is murder in the second degree. So also, when a person takes the life of another without deliberation and premeditation, and when he is not excused or justified by law, but upon the spur of the moment in a sudden inconsiderate transport of passion, the law under such circumstances will imply malice, and the homicide would be murder in the second degree."

Let us take the illustrations given by the learned judge, and see if they portrayed to the jury, or were calculated to convey to the jury, a correct knowledge of implied malice. The first is, "If a homicide is committed and there is not evidence sufficient to show express malice, nor to excuse or justify the act, the law presumes malice which is termed implied malice, and the killing is murder in the second degree." A homicide may be committed under the exact state of case given in the above (example) illustration, and yet the deduction therefrom of malice or murder in the second degree would not of necessity follow. Both kinds of negligent homicide, as well as manslaughter, are homicides "without evidence sufficient to show express malice, or to excuse or justify the act."

Second illustration: "So also when one person takes the life of another, without deliberation and premeditation, and when he is not excused or justified by law, but upon the spur of the moment, in a sudden inconsiderate transport of passion, the law under such circumstances will imply malice." * * * * That depends most clearly and emphatically upon the existence or non-existence of other facts in the case. If the passion arose from an adequate cause, given at the time, and the killing was caused by the passion, and the passion was not the result of a former provocation, etc., the law would not imply malice, and the homicide would not be murder in the second degree, but manslaughter. Hence the absolute necessity, in defining the lower boundary line of murder, when there is evidence tending to raise an issue upon lower degrees, to-wit, negligent homicide or manslaughter, to make that degree (tended to be presented by the evidence), as well as excusable or justifiable homicide, a part of the boundary line. This subject, we think, is elaborately discussed in Neyland v. The State, decided at the last Galveston term. (13 Texas Ct. App., 536.)

We have been proceeding upon the assumption that manslaughter is an issue raised by evidence in this case. For if no such issue is presented by evidence, there being no objections made to the charge, and no instructions asked by defendant,

we would treat the case from quite a different standpoint. The question would then be—all lower degrees being out of the case —whether a failure to submit a perfectly correct charge upon implied malice, or upon murder of the second degree, wrought an injury to defendant? Let us now proceed to ascertain if there was evidence presenting manslaughter as an issue in the case; for if so, the charge of the court was evidently calculated to injuriously affect the rights of defendant.

It appears from the statement of facts that an old man by the name of Everett had been knocked down by Barnes, the deceased, in Harkness's saloon, and while he was lying upon the floor the defendant rode up, looked in the saloon, and, seeing the old man lying upon the floor, said "whoever did that was a d—d coward, and that he (defendant) could whip him." The witness Ridley spoke to defendant, "telling him that he would not do so, as it was done and could not be helped." Defendant replied that he would not, stating that he wanted to see Bill Daugherty, and rode over to Bibb's store. When defendant got to Bibb's store he spoke to Daugherty, and said: "What kind of people have you got here that will beat up an old man like the one over at the grocery?" About that time Barnes, the deceased, came up, and asked defendant if he took it up. The witness Daugherty thinks the defendant replied: "I don't know but what I do." As to what followed the witnesses are not harmonious.

T. B. Bibb, a witness for the State, swore: "I was present when James H. Barnes was killed. Deceased and Henman came in town that day on business. When I came up out of the cellar, I found there was a difficulty on hand. Mr. Reynolds rode over to the store and spoke, I think, to Mr. Daugherty, and asked if that was the way they treated old men here in Frio; and Mr. Barnes asked him if he took it up, and started toward Mr. Reynolds, and caught Mr. Reynolds's horse by the mane or neck, with one hand, and with the other he took hold of him somewhere on the thigh or hip; and the horse Mr. Reynolds was on whirled around once or twice, and Mr. Reynolds told Mr. Barnes to turn him loose. Barnes did not do it, and defendant struck him over the head with his pistol, and when he struck him Mr. Barnes staggered back toward the gallery, and still held on to the bridle of Mr. Reynolds's horse, with both hands; and it seems to me the horse pulled back and Mr. Barnes came up again, and the horse whirled around two or three times, and

B1

Mr. Reynolds told him several times to turn him loose; and Mr. Reynolds fired and Mr. Barnes sank down, and some one, I think Mr. Daugherty, caught him and laid him down. I do not know whether he died there or whether he died after we carried him in the house. When we got him in the house he was dead."

Cross-examined by the defendant, the witness testified: "I was there when Mr. Reynolds came up. I was talking to Henman and trying to get him to take Barnes out of town, for I thought he would get into trouble. The reason I thought he would get into trouble was on account of what had occurred with Barnes and old man Everett. When Reynolds came up he spoke to Mr. Daugherty. When deceased went toward Mr. Reynolds he went in a southwest direction from my store. He came from a northeast direction, and caught the horse of Mr. Reynolds by the mane or bridle with one hand. Mr. Reynolds tried to pull the horse loose from him, and I don't think he turned the bridle loose. I don't know whether he was trying to get hold of Reynolds or the pistol; it looked to me like he was trying to get hold of Reynolds's pistol. After he was struck I can't say what. I do not know exactly how long I have known the defendant. I think I met him some time after I came to Texas, which was several years ago. I do not remember how long it is. I had known Barnes several months; he lived at Mr. Crouch's ranch in this county. Reynolds is a cattle man, and lives at Uvalde. Mr. Barnes was not drunk when he left my store. I hallooed at Mr. Reynolds not to shoot, but he did not hear me, for just as I spoke the pistol fired."

Instead of proving that the defendant knew that Barnes was the party that knocked old man Everett down in the saloon, the evidence leads to a different conclusion. It will also be borne in mind that defendant made the remarks to Daugherty in reference to this matter, and not to the deceased.

But suppose there is evidence tending to prove that defendant provoked the difficulty, this would only present another phase of the case. The question that is decisive of this case is whether there is evidence tending to raise the issue of manslaughter. Suppose the jury should take the view of the case which is presented by the testimony of Bibb? Or, to present the point in another light, suppose the evidence of Bibb constituted the case, the whole case? Would it not have been the duty of the trial judge to have submitted to the jury, by proper instructions, the law of manslaughter? We think so. Defendant was seized by

Barnes, he, Barnes, being armed with a pistol, and his (defendant's) own weapon being attempted to be taken from him. He demanded repeatedly to be released, and, to effect his release, struck Barnes with his pistol. This failing, he shot him.

While it may be true that Barnes's pistol was fastened to its scabbard so that it could not be drawn, this fact is not shown by the evidence to have been known by the defendant. He may or may not have known it. The testimony being silent at this point, what is the presumption? It is in favor of the defendant, as all presumptions are in his favor until they are eliminated by proof.

We will not enter upon a discussion of the facts, but will say that in our opinion they tend to present the question of manslaughter. This being the case, what is the rule?

We do not believe that a clearer statement of the correct rule upon this subject can be made than is made by Mr. Thompson in his little work on charging the jury. He states it thus:

"The judge instructs hypothetically upon whatever state of facts there is evidence tending to prove. It is error for him to submit to the jury a fact or state of facts which there is no evidence tending to prove, or to give an instruction with reference to a state of facts not in evidence. But, in order to justify him in giving an instruction predicated upon a supposed state of facts, it is not necessary that he should be entirely satisfied of the existence of such facts; but, if there is evidence from which the jury may infer them to be true, it is his duty to declare the law thereon, and it is not error for him to do so even when the evidence is very slight."

The principles enunciated by Mr. Thompson are sustained by a long line of decisions by our Supreme as well as this court.

Because the court erred in its charge upon implied malice, and because the law of manslaughter was not given in charge to the jury, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 13, 1883.